UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

OVERNIGHT, LLC,                                                            Civ. Action No. ____

                Plaintiff,                                       :

  -against-                                                                    **JURY TRIAL DEMANDED**

AARON KAUFMAN,                                                         :

                Defendant.

------------------------------------------------------------------x

## COMPLAINT

Overnight LLC, a Delaware limited liability company, with its principal place of business in New York City ("Overnight"), as and for its Complaint against Aaron Kaufman, a resident of New Jersey ("Kaufman"), by its undersigned counsel, alleges as follows:

### Nature of the Action

1. This diversity action is for breach of contract, breach of fiduciary duty and misappropriation of corporate opportunity against Overnight's former president and chief operating officer. Overnight is an independent motion picture production company led by the producer Rick Schwartz. Among other things, Kaufman misrepresented his knowledge, skill and experience, pretended to be knowledgeable about the financing of motion pictures when he was not, secured financing for Overnight's motion picture business by obtaining loans without consent on criminally usurious terms while at the same time giving away, also without consent, valuable guaranteed producer fees, credits and other compensation owed to Overnight. Further, before these gross lapses in judgment were discovered, Kaufman held Overnight's contractual

obligation to obtain financing for the motion picture "Black Swan" hostage to demands that Kaufman be let out of his contract to pursue a personal business venture – a demand which irreparably harmed Overnight's relationship with other investors in "Black Swan," ultimately forced Schwartz to forfeit his producer credit for "Black Swan," damaged Overnight's ability to raise money from its own investors, and otherwise hurt Schwartz's reputation in the motion picture industry.

2. Even worse, the personal business venture that Kaufman elected to pursue instead of fulfilling the obligations he owed to Overnight on "Black Swan," involved the misappropriation of Overnight's relationship and goodwill with Robert Rodriguez, the director of "Machete." Schwartz introduced Kaufman to Rodriguez and Kaufman knew that any relationship he might have developed with Rodriguez would have been a corporate opportunity that belonged to Overnight, not to him. In addition, while still employed by Overnight, Kaufman went so far as to solicit one of Overnight's key employees to join him in this new venture with Rodriguez -- thereby interfering with Overnight's obligations on other motion picture projects for which this employee was responsible.

3. As demonstrated below, these actions on the part of Kaufman, who at all relevant times herein placed his own personal financial interests ahead of those of the company for whom he worked and owed an undivided duty of loyalty, have cost plaintiff millions of dollars in lost revenues, lost opportunities, loss to reputation, and other losses.

## Jurisdiction

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. 1332(a)(1) because the action is between citizens of different States and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

## Venue

5. Venue is proper in this Court under 28 U.S.C. 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York, where plaintiff Overnight LLC is located.

## Parties

6. Plaintiff Overnight LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in New York City.

7. Defendant Aaron Kaufman is, upon information and belief, a citizen of the State of New Jersey.

## Background Facts

8. A film producer is in the business of making motion pictures. A producer often has his or her own production company complete with all of the creative, technical and financial personnel necessary to complete a project. A producer is usually involved with a specific project from the very first reading of a promising script to the final distribution and promotion of a completed film. An "Executive Producer" is a title generally given to someone who is less involved in the overall aspect of producing a film. Only a film's "Producer" is eligible for industry recognition in the form of a Golden Globe or an Academy Award.

9. Overnight is an independent motion picture production company formed by the producer Rick Schwartz. Over his 15-year career, Schwartz has helped produce a number of hit films such as "Machete," "Gangs of New York," "The Aviator," "The Others," and many others.

10. Kaufman was Overnight's president and chief operating officer from February 2009 until his termination in December 2009. Prior to his hiring, Kaufman worked briefly for Barbarian Films, a media investment fund and production company, which structured financing for independently produced films. Before that, he was vice president of a private equity group based in Hong Kong that specialized in film and media investment.

11. Prior to his hiring by Overnight, Kaufman had represented to Schwartz and Overnight's investors that he had the requisite knowledge, skill and experience to perform the duties of co-producer and chief operating officer of an independent motion picture production company with specific responsibilities for arranging film financing and securing investors. In fact, Kaufman willfully concealed from Schwartz and others at Overnight that Kaufman had deceived his prior employer, Barbarian Films, by falsely representing to prospective investors of Barbarian that they would get a prompt return on their investment within 90 days – ahead of Barbarian's principal bank lender -- and that, unlike other investors in Barbarian whose money would be tied up for a minimum of five years, they would be permitted to withdraw their investment after only a year. In fact, Kaufman knew these representations to be false, but he made them nevertheless, in writing, without Barbarian's knowledge or consent, in order to induce investors to part with their money and thereby create the false and misleading impression to Barbarian and others in the industry that he could quickly and successfully raise money from investors. As a result of these misrepresentations by Kaufman, Barbarian Films – and Kaufman personally – were sued for fraud by Barbarian's investors. Kaufman left Barbarian, did not

4

defend the allegations made against him, and literally left Barbarian holding the bag – a pattern Kaufman would repeat – with even worse consequences -- during his relatively brief tenure at Overnight. A copy of the legal papers filed against Kaufman in the case, "Sheck et al. v. Barbarian Films, LLC, et al.," pending the Supreme Court of the State of New York, New York County, Index No. 103918/10, is attached hereto as Ex. 1.

12. Kaufman was hired by Overnight on or about February 16, 2009, at which time Overnight and Kaufman entered into several agreements, including an Employment Agreement and a Proprietary Information and Invention Agreement. Under the terms of the Employment Agreement, Kaufman was to be president and chief operating officer of Overnight, and also a member of its Operating Committee, reporting to Rick Schwartz, the chief executive officer of Overnight. A copy of the Employment Agreement is attached hereto as Ex. 2 and a copy of the Proprietary Information and Invention Agreement is attached hereto as Ex. 3.

**The Employment Contract**

13. Under the terms of his employment agreement, Kaufman was to serve as Overnight's president and chief operating officer responsible for, among other things, negotiating, structuring and implementing financing of individual film projects and any potential overall film fund for Overnight's development slate. He was also to oversee investor relations, serve as in-house producer in tandem with Mr. Schwartz, and oversee day-to-day operations of Overnight. The contract provided, in pertinent part, that Kaufman was also to devote "on a full-time basis," all necessary time, energy, knowledge, skill and best efforts to the business of Overnight. He was to be paid a salary of $250,000, receive equity in the company, a bonus, and certain other deferred compensation.

14. In addition, Kaufman became party to a certain Proprietary Information and Invention Agreement," with Overnight, dated as of February 16, 2009. Among other things, Kaufman was required to keep confidential all "information concerning the personal and/or business affairs of Rick Schwartz . . . including the names and addresses of . . . personal friends and business associates . . . their . . . activities and affairs and professional activities in the entertainment industry." Specifically, Kaufmann was prohibited from directly or indirectly using or exploiting "the Confidential Information at any time from and after the date hereof and after termination of [Kaufman's] employment with [Overnight] for any purpose other than in connection with his employment duties and obligations to Company." Further, Kaufman agreed that "[any gain or profit of any kind or nature obtained or derived by [Kaufman] from the use or exploitation of the Confidential Information shall be held in trust by [Kaufman] for the express benefit of [Overnight] and shall be remitted thereby to [Overnight].. ."

15. Kaufman was also prohibited during the period of his employment with Overnight, and "continuing through the first anniversary of the date on which such employment terminates," from directly or indirectly soliciting, inducing, recruiting or encouraging any of [Overnight's] employees to leave their employment or take any such employees, or "attempt to solicit, induce, recruit, encourage or take any employees of [Overnight] either for [Kaufman] or on behalf of any other Person."

16. The Agreement also provides that in the event Overnight is required to pursue legal action to enforce all or any part of this Agreement, the other party shall be responsible for "all reasonable attorney's fees and court costs incurred by the enforcing party, in addition to any other remedies allowed by law or in equity."

**Kaufman's work on "Machete"**

17.     One of Kaufman's assignments while at Overnight was to work as a co-producer of "Machete" – a feature film written and directed by the Texas based director Robert Rodriguez. Schwartz, who had known the influential writer/director for many years, had introduced Kaufman to Rodriguez. They developed a relationship when Schwartz was a key executive at Miramax Films, and Rodriguez made all of his films at that studio. Machete Chop Shop, LLC, an Overnight affiliate, had acquired rights to the "Machete" screenplay and, as owner of the rights, was responsible for, among other things, arranging the financing to get the motion picture made. That was to be Kaufman's responsibility.

18.     "Machete" filmed from August 3 to September 21, 2010 in Austin, Texas. However, Kaufman failed to arrange financing by the time the film was to start shooting. At the last minute, Kaufman obtained a $750,000 loan from a pair of New Jersey businessmen, Gerald and Peter Fruchtman. But Kaufman was so desperate and reckless that he agreed – without Schwartz's knowledge or consent -- to pay a "financing fee" to the Fruchtmans of $45,000 a week until the loan was repaid. In other words, the interest on the $750,000 loan amounted to 312% a year. Such interest is criminally usurious under the law of the State of New York, which is the law that governed this loan. A copy of the "term sheet" where these terms were set forth is attached hereto as Ex. 4. Even worse, unbeknownst to Schwartz or anyone else at Overnight, Kaufman entered into a written agreement to pay a substantial finder's fee to the third party broker who introduced him to the Fruchtmans. A copy of the lawsuit filed against Kaufman for failing to pay the finder's fee is attached hereto as Ex. 5.

19. At or around the same time that he was scrambling to find financing for "Machete," Kaufman, who had temporarily relocated to Austin, Texas where "Machete" was shooting, was secretly putting together a plan to create a production company of his own with Rodriguez. Such conduct was strictly forbidden under the terms of Kaufman's written contract with Overnight, which required him to devote his "full time" exclusively to Overnight and which further barred Kaufman from appropriating for himself any prospective business relationships with film directors he was introduced to by Schwartz. Any such relationship was a corporate opportunity that belonged not to Kaufman, but to Overnight.

20. As part of his plan, on or about August 24, 2009, Kaufman created a PowerPoint presentation for his business venture with Rodriguez. Among other things, the plan called for Kaufman to provide for Rodriguez the same production services that Kaufman was contractually required to provide exclusively for Overnight. And, in an effort to show he had financial connections which he in fact did not really have, Kaufman touted his relationships with, among other people, the Fruchtmans, as well as several internationally known investment banks, such as Allen & Co. and Goldman Sachs, as well as Comerica, Societe Generale, Union Bank and J. P. Morgan Chase. He also touted relationships with well-known domestic and foreign motion picture distributors Sony, Lionsgate, Alliance and Icon. All of these well-known names and contacts in the film financing business came from Schwartz' personal rolodex. And because as part of the financing for "Machete," Kaufman had arranged a loan to finance an expected tax credit to be issued by the State of Texas, here too Kaufman proposed that he and Rodriguez themselves get into the business of issuing loans to finance anticipated tax credits from Texas and other states. As it later turned out, the loan Kaufman obtained to finance the tax credit for "Machete" was declared in default when, as a result of Kaufman's failure to make sure the

8

conditions for obtaining the credit were met, the State of Texas exercised its right not to grant such credit, potentially costing Overnight hundreds of thousands of dollars in lost revenue. A copy of Kaufman's PowerPoint presentation is attached hereto as Ex. 6. A copy of the Notice of Default in connection with the tax credit for "Machete" is attached hereto as Ex. 7.

21. Thereafter, on or about October 9, 2009, while still employed by Overnight, and unbeknownst to Schwartz and Overnight's investors, Kaufman secured an engagement letter from MESA Securities Inc. in New York City to represent the venture with Rodriguez in connection with raising $100 million to $300 million to finance "the production and distribution of their upcoming slate of feature-length motion pictures" – which was what Kaufman should have been doing not for this venture with Rodriguez, but for Overnight. A copy of the MESA letter, addressed to Kaufman, among others, is attached hereto as Ex. 8.

22. At the same time that he was pursuing this venture with Rodriguez, and even though his contract with Overnight strictly forbid him from doing so, Kaufman was also trying to entice Iliana Nikolic, an Overnight employee working with Kaufman on "Machete" in Austin, to leave Overnight and join him. Nikolic's responsibilities included overseeing the physical production work for Overnight on several films besides "Machete", maintaining the budgets of each film and ensuring smooth delivery of key elements in post-production. Kaufman knew that soliciting Nikolic to leave Overnight, which he succeeded in doing, would cause substantial harm to Overnight. In fact, Kaufman was so determined to inflict maximum harm on Overnight that he used his own company email address to forward Nikolic's letter of resignation from Overnight, which was dated October 9, 2009. A copy of the Nikolis resignation letter forwarded to Overnight from Kaufman's email address is attached hereto as Ex. 9. What is more, unbeknownst to Schwartz and Overnight's investors, at the same time that he was trying to get

9

her to leave Overnight, the married Kaufman was simultaneously pursuing Nikolic sexually, which would have potentially exposed Overnight to substantial liability. Copies of emails documenting such activity were left on Kaufman's email account at Overnight when he left the company.

### Kaufman's Failures on "Black Swan"

23.  Matters came to a head in October 2009, when Kaufman gave Schwartz notice that he wanted to be let out of his contract. Schwartz, however, needed Kaufman to complete the financing for "Black Swan," which was another major motion picture that Schwartz and Overnight were contractually responsible for producing. "Black Swan" was to be directed by acclaimed filmmaker Darren Aronofsky, and was to star the actress Natalie Portman. Schwartz had secured the rights to produce "Black Swan" after selecting the script from hundreds he had been submitted and concluding that it had the potential to be both a critical and commercial success.

24.  Once again, faced with having to arrange financing for a major motion picture, but lacking the requisite skills and connections to know how to do it properly – and looking to get out from under his contract with Overnight to pursue his otherwise unlawful venture with Rodriguez, Kaufman refused to arrange the financing for "Black Swan" unless Schwartz agreed to give him an unconditional release from his contract. In short, Kaufman decided to hold the financing for "Black Swan" hostage to his personal desire to leave Overnight, take a valuable corporate opportunity belonging to Overnight with him, and be released from all liability and damages he had created for Overnight.

25. At the same time, while demanding that he be released from his contract, Kaufman was desperate to show Schwartz and Overnight's investors that he was still working on arranging the financing for "Black Swan," when in fact he was pursuing his own personal interests with no regard for the fiduciary and contractual obligations he owed to Overnight.

26. Thus, on or around October 14, 2009, Kaufman agreed to so-called "bridge loan" financing for "Black Swan" – once again with Gerald and Peter Fruchtman. Here the loan was initially in the amount of $600,000, with a "financing fee" equal to $36,000 per week, which, if the loan were not repaid within three weeks, would escalate to $40,000 per week. In addition, as security for the repayment of the loan and fees, and without Schwartz's knowledge or consent, or the consent of Overnight's investors, Kaufman gave the Fruchtmans a security interest in Overnight's producer fee for "Machete" of $750,000, plus a 20% premium thereon, for a total of $900,000. Then, eight days later, on or about October 22, 2009, again without Schwartz's knowledge or consent, and without the consent of Overnight's investors, Kaufman increased the loan from the Fruchtmans by another $375,000, for which they were to receive an additional "financing fee" of $22,500 per week which, if the additional loan was not repaid within two weeks, would escalate to $25,000 per week. Thus, total financing fees on the $975,000, if not paid within three weeks, would come to $65,000 per week, or $3.38 million per year. Furthermore, Kaufman agreed to increase the security interest he gave the Fruchtmans in Overnight's right to monies from "Machete" by assigning to the Fruchtmans Overnight's 28% participation in the "net proceeds" of "Machete." Copies of the "term sheets" for these loans are attached as Ex. 10.

27. Under the New York penal code, Section 190.40, a person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he

knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period.

28.     Here, without even taking into account the security interest that was given in "Machete" funds, the total combined "financing fees" on the $975,000 loan result in an astounding effective interest rate of around 346% per annum. Such a transaction is clearly illegal and unenforceable under New York's criminal usury statute. Accordingly, any security interest conveyed in connection with such a transaction to repay these criminally usurious amounts was likewise illegal and unenforceable under New York law.

29.     None of these criminally usurious transactions with the Fruchtmans were fully disclosed or described to Schwartz or Overnight's investors because, throughout the time when these transactions were being negotiated by Kaufman, Kaufman was generally not in communication with anyone from Overnight except in writing to demand the release from his contract.

30.     By the end of October 2009, Kaufman simply stopped working for Overnight altogether, and stopped returning calls from the artists representatives associated with "Black Swan" who were anxious to know when financing for the film would be completed, since principal photography was due to begin imminently. As a result of Kaufman's absence – and with millions of dollars already committed to the director, talent and crew to start filming the project, Kaufman was told by the artists representatives on "Black Swan" to "cease and desist" having anything to do with the film. In the meantime, Fox Searchlight LLC and Cross Creek Pictures LLC, two other motion picture production companies, were brought in to complete the

12

necessary financing. As a result of Kaufman's failure to follow through on his responsibilities for Overnight, Schwartz, who was contracted to be the film's "producer" and had acted as such for months during pre-production, lost his "producer" credit on "Black Swan" and was relegated instead to an "executive producer" credit. Consequently, and as a direct result of Kaufman's actions, when the film was nominated for a 2010 Golden Globe for Best Picture on December 14, 2010, Schwartz was not among the group of producers to be named. If the film is nominated for an Academy Award, as many expect it will be, Schwartz will not be eligible to accept the award. Indeed, Schwartz was penalized by the new financiers, studio and the artist's representatives by having his name and Overnight's omitted from all posters, trailers, TV spots, newspapers and other paid advertising for the film. In summary, Schwartz, who had originally secured the rights to produce "Black Swan," had worked with the writer on multiple drafts of the script and helped cast the movie, will not be eligible for any industry recognition at all for what would be the motion picture industry's highest honor. A copy of the agreement with Overnight memorializing these changes to Schwartz's status on "Black Swan" is attached hereto as Ex. 11.

31. In or about November 2009, Overnight notified Kaufman that he was being terminated for cause and, in accordance with his employment agreement, gave him 30 days to cure. Kaufman did not respond and was terminated for cause as of December 18, 2009. Thereafter, as planned, he launched a motion picture production company with the director Robert Rodriguez, taking Iliana Nikolic with him in this new venture. Copies of the notice to cure and notice of termination are attached hereto as Ex. 12.

### As and for a First Cause of Action for Breach of Contract

32. Overnight repeats and realleges paragraphs 1 through 31 as if fully alleged herein.

33. As indicated above, Kaufman was a party to an Employment Agreement and a Proprietary Information and Invention Agreement with Overnight dated as of February 16, 2009. Those agreements required Kaufman, among other things, to devote his timely exclusively to the work of Overnight, expressly forbid him from working on other business ventures in competition with Overnight, expressly forbid him from soliciting Overnight employees for any competing businesses, and expressly forbid him from misappropriating confidential business relationships for his own business. As demonstrated above, Kaufman breached each of these contractual obligations to Overnight.

34. By reason of the foregoing, Overnight has been damaged in an amount to be determined at trial, but which is believed to be at least $10 million, plus reasonable attorneys fees for which the prevailing party in any suit to enforce rights under these agreements is entitled to recover.

### As and for a Second Cause of Action for Breach of Fiduciary Duty

35. Overnight repeats and realleges paragraphs 1 through 34 as if fully alleged herein.

36. A fiduciary relationship exists when one has reposed trust or confidence in the integrity or fidelity over another who thereby gains a resulting superiority or influence over the first. A fiduciary duty arises whenever one person is under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation.

37. Here, Kaufman was hired to be Overnight's president and chief operating officer in charge of securing financing for Overnight's portfolio of motion picture projects, including, among others, "Machete" and "Black Swan." As such, Kaufman owed Overnight fiduciary duties of loyalty and to act with reasonable competence and diligence.

38.     As demonstrated above, Kaufman breached his fiduciary duties by committing Overnight to criminally usurious financing deals, by giving away valuable producer fees, credits and percentage shares of film proceeds in order to secure even more criminally usurious financing deals, by failing to secure financing for the film "Black Swan," resulting in Schwartz's termination as "producer" on that project, and the loss of any industry recognition as "producer," by hiring away a valued employee while he was still employed by Overnight and, in connection with his working to develop a business relationship of his own with the director Robert Rodriguez, by usurping a corporate opportunity that belonged to Overnight.

39.     By reason of the foregoing, Overnight was damaged in an amount to be determined at trial, but which is believed to be in excess of $10 million.

**As and for a Third Cause of Action for Misappropriation of Corporate Opportunity**

40.     Overnight repeats and realleges paragraphs 1 through 39 as if fully alleged herein.

41.     The doctrine of corporate opportunity prohibits one who occupies a fiduciary relationship to a corporation from acquiring, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy. A corporate opportunity exists when a proposed activity is reasonably incident to the corporation's present or prospective business and is one in which the corporation has the capacity to engage.

42.     Furthermore, under the parties' Proprietary Information and Invention Agreement, Kaufman was required to keep confidential all "information concerning the personal and/or business affairs of Rick Schwartz . . . including the names and addresses of . . . personal friends and business associates . . . their . . . activities and affairs and professional activities in the entertainment industry." In addition, he was expressly prohibited from directly or indirectly

using or exploiting "the Confidential Information at any time from and after the date hereof and after termination of [Kaufman's] employment with [Overnight] for any purpose other than in connection with his employment duties and obligations to Company." Further, Kaufman agreed that "[any gain or profit of any kind or nature obtained or derived by [Kaufman] from the use or exploitation of the Confidential Information shall be held in trust by [Kaufman] for the express benefit of [Overnight] and shall be remitted thereby to [Overnight]..."

43. Here, Schwartz introduced Kaufman to the director Robert Rodriguez with whom Schwartz had a personal and business relationship, and directly and indirectly used and exploited that relationship while he was still employed by Overnight to develop their own motion picture production company to compete with Overnight. Indeed, after Kaufman's employment with Overnight was finally terminated for cause, Kaufman began formally working with Rodriguez on developing their business.

44. Kaufman's actions constitute the misappropriation of a corporate opportunity that belonged to Overnight and, in accordance with Kaufman's agreement with Overnight, any gain or profit of any kind of nature obtained or derived by Kaufman from the use or exploitation of that opportunity must be held in trust for the express benefit of Overnight and must be remitted thereby to Overnight.

45. By reason of the foregoing, Overnight has been damaged in an amount to be determined at trial, but which is believed to be least $10 million.

WHEREFORE, plaintiff Overnight LLC demands relief as follows:

1.   On the first cause of action for breach of contract, entry of judgment against Kaufman in an amount to be determined at trial, but which is believed to be in excess of $10 million, plus reasonable attorneys fees;

2.   On the second cause of action for breach of fiduciary duty, entry of judgment against Kaufman in an amount to be determined at trial, but which is believed to be in excess of $10 million, plus punitive damages, and reasonable attorneys fees;

3.   On the third cause of action for misappropriation of corporate opportunity, entry of judgment against Kaufman in an amount to be determined at trial, estimated to be in excess of $10 million, plus an award of any gain or profit of any kind or nature obtained or derived by Kaufman from the use or exploitation of Overnight's relationship with the director Robert Rodriguez; and

4. Such other and further relief as this Court deems just and equitable.

Dated:  New York, New York
        December 22, 2010

VANDENBERG & FELIU, LLP

By: _____

Robert B. Bernstein, Esq. (RBB-1934)
60 East 42d Street, 51st Floor
New York, New York 10165
(212) 763-6804
rbernstein@vanfeliiu.com
Attorneys for Plaintiff Overnight LLC