UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
OVERNIGHT, LLC,

                Plaintiff,

v.

AARON KAUFMAN,

                Defendant.
----------------------------------------X

10-CIV-9564

**DECLARATION OF AARON KAUFMAN**

Aaron Kaufman declares, under penalty of perjury, pursuant to 28 USCA § 1746, that the following is true and correct:

1. I am the defendant in this action and have personal knowledge of the matters contained herein. I submit this affidavit in opposition to Plaintiff's motion for a default judgment.

**Personal and Professional Background**

2. I currently reside in Austin, Texas. Since the end of 2009, and until January 2011, I had been traveling back and forth between Austin and New Jersey on a regular basis and residing in temporary quarters in Austin. In January 2011, I leased an apartment in Austin.

3. I am presently self-employed in Texas as a consultant. In that capacity, I perform film development, production and finance consulting services for a business named Quickdraw Productions, LLC which is owned by well known filmmaker Robert Rodriguez. I have worked in the film industry for approximately 11 years. In that time I have developed numerous relationships with well known filmmakers and have successfully structured over $100 million in film financing. I have built strong and ongoing relationships with film financing entities in the equity and debt financing areas with whom I have worked with repeatedly.

4. Since approximately late summer/early fall 2010, I have been separated from my wife who resides with my children in an apartment located at 105 Russell Avenue, Edgewater New Jersey ("New Jersey Address"). While I do return to the apartment from time to time, I do not reside in the apartment. I moved my personal effects out of my family's home in Edgewater, New Jersey in December 2010 prior to December 23, 2010.

**Service of Process of the Complaint**

5. By December 23rd, I no longer lived at the New Jersey Address. I resided in Austin, Texas at that time.

6. I was unaware that any effort had been made to deliver the Complaint to the New Jersey Address on December 23, 24, 28 or 29.

7. I was unaware that a package bearing the legend "Personal and Confidential" was mailed to the New Jersey Address. Prior to my being served with the Motion for Default Judgment, my wife had not advised me that such a package was delivered to the New Jersey address.

8. Upon learning, in connection with responding to the instant motion, that an affidavit was filed asserting that such a package was delivered, I asked my wife if such a package had arrived. She checked a pile of mail that she had put aside for me and advised me that a package addressed to me and marked "Personal and Confidential" had been delivered. This was the first I learned that the package was mailed to the New Jersey address.

9. 105 Russell Avenue, Edgewater, New Jersey is an apartment building. There is a concierge for the building with whom packages can be left.

10. I have never been employed by Trouble Maker Studios which is a production


---

company also owned by filmmaker Robert Rodriguez. In 2010, I did some consulting work for Troublemaker Studios but I was never employed by Troublemaker and never had an office or telephone number at Troublemaker or worked at that location.

11. I do not know anyone named Lonnie Edwards who is purportedly a security concierge employed at the building located at 4900 Old Manor Road, Austin, TX. I have never appointed Lonnie Edwards as an agent to accept service of process or anything else on my behalf.

12. At some point I learned that a Complaint was delivered to TroubleMaker Studios but I did not believe this was proper service since I do not work there.

13. According to the affidavits filed with the Court, a copy of the Complaint was delivered to 6464 Sunset Boulevard, Suite 800, Los Angeles, California and delivered to "Kate Trefry." That is the location of a business called Bold Films, Inc. I have never lived nor worked at that location. I have never been employed by Bold Films or performed any services for that business. I do not know Kate Trefry. However, an investor in Bold Films is an investor in a business run by Robert Rodriguez for whom I provide consulting services. I have no explanation as to why Plaintiff would attempt to serve me at that location, other than to attempt to embarrass me before my industry colleagues.

14. According to the affidavits filed with the Court, a copy of the Complaint was delivered to 9601 Jefferson Blvd., Suite A, Culver City, California and delivered to Stephanie. This is the location of a film business called Old Lot. I have never lived nor worked at that location and do not know Stephanie. I have never been employed by that company or performed any services for that business. However, ane investor in Odd Lot is an investor in a business run by Robert Rodriguez for whom I provide consulting services. I have no explanation as to why

Plaintiff would attempt to serve me at that location, other than to attempt to embarrass me before my industry colleagues.

15. I have never resided in California nor worked in California except on a temporary business trip basis.

16. On March 15, 2011, I attended a prestigious film festival in Austin, Texas, known as "South by Southwest." I had been asked to conduct a panel, before a few hundred people, on the subject of film financing and my appearance at the festival had been publicized long prior to the event. Immediately following the completion of the panel discussion, and at a time surrounded by many people who had approached to ask follow-up questions of the panelists, an individual hand delivered to me an envelope. That envelope contained the Motion for Default Judgment.

17. Immediately upon receipt of the Motion for Default Judgment, I started contacting counsel to obtain representation in this matter. Shortly thereafter, I retained Krantz & Berman, LLP to represent me in this action.

**Meritorious Defense Facts**

18. I entered into an employment agreement with Overnight dated February 9, 2009. Rick Schwartz, Overnight's principal and I had worked together on a prior film.

19. Shortly after I began work, I heard, from film director Robert Rodriguez's agents that he was interested in producing one of his fake trailers from the movie "Grindhouse" into a feature film. I conceived the idea of reaching out to Rodriguez through my contacts and pitched the idea of having Overnight produce the film *Machete* with Rodriguez.

20. Rick Schwartz did not have a prior relationship with Rodriguez and did not introduce me to him. Quite to the contrary, I introduced Rick Schwartz to Rodriguez.

21. I was responsible for securing the financing for *Machete* and accomplished this quite successfully, with Schwartz's knowledge, input and approval. Overnight recouped all of its initial investment in *Machete* and a 20% preferred return.

22. During the course of filming *Machete*, Rodriguez and I had considerable professional interaction with one another. Rodriguez would, from time to time, seek my opinion and information relating to my area of expertise. As a matter of professional courtesy and because Overnight and Rodriquez were co-producing *Machete*, I happily responded to these requests.

23. At some point, Rodriguez asked me to put in writing some of my ideas. . I did not share with Rodriquez any confidential information nor provide to Rodriguez any film finance contacts that Rodriquez was not already aware of based upon co-producing *Machete*. I did not share with Rodriguez any names or contacts from "Schwartz's personal rolodex" nor would I need to. Indeed Schwartz did not have such contacts – which was precisely why he had hired me. At the time Rodriguez and I were having these discussions, we were not discussing working together and had no plan to do so.

24. Following the filming of *Machete*, Overnight began work on *Black Swan*. I was responsible for securing the financing for the film. The work I performed was successful in launching the project, within industry norms and with Schwartz's knowledge, input and approval. Indeed, Schwartz signed off on the financing and investment plans for *Black Swan*.

25. As the months passed in 2009, the relationship between Schwartz and me grew increasingly strained. As a result of an audit required by an investor, certain financial irregularities were uncovered, and when I learned that Schwartz was running certain personal expenses through Overnight, I questioned Schwartz about it. This infuriated Schwartz. Further,

Schwartz had a series of bizarre encounters in the industry resulting in erratic and questionable behavior. This behavior included missed meetings with investors, refusal to timely pay me for my services and emotional blowups in front of financiers and bond companies which damaged Overnight's business relationships.

26. As the strain continued, I realized that I could no longer work effectively with Schwartz. Accordingly, in or about September 2009, I approached Schwartz to discuss the severing of the relationship. Recognizing the difficulties in the employment relationship, Schwartz agreed to release me from my contract provided that I agreed to complete the financing phase of *Black Swan* which I agreed to do.

27. However, shortly thereafter Schwartz advised me that I could no longer work on financing for Black Swan. In November 2009 he terminated me. Prior to advising me of his termination, Schwartz notified industry professionals that I had been fired.

28. Following my termination from Overnight, I formed a consulting company in Texas and continued to work in film financing. In setting up my company and performing services, I have never used confidential information or contacts belonging to Overnight. Indeed, none of my contacts ever originated with Schwartz. Robert Rodriguez retained my services and continues to do so.

29. While employed by Overnight, I did not compete with Overnight or work for any business other than Overnight.

30. Multiple other employees have left Overnight before and after me, for a variety of reasons, but I did not solicit their departure.

31. Following my departure from Overnight, Schwartz, on multiple occasions, sent e-

mails from my e-mail address at Overnight, pretending to be me. These e-mails were intended to, and did, damage my relationships in the industry.

32. Overnight profited from my work on both *Machete* and *Black Swan*. In the case of both films, it recouped its investment and received a profitable return.

33. I was long terminated by Overnight when its designation in *Black Swan* changed from Producer to Executive Producer. That change was caused solely by Schwartz's conduct and decisions.

Dated: Austin, Texas
April 1, 2011

Aaron Kaufman